## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:19-cr-123-DBH |
| | ) | |
| DAMON FAGAN | ) | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO
### DEFENDANT'S MOTIONS TO SUPPRESS

The United States of America, by and through its undersigned counsel, respectfully

submits the following response in opposition to Defendant Damon Fagan's Motion to Suppress

(ECF No. 46).  For the reasons outlined herein, the Court should deny the Motion.

### ANTICIPATED FACTS

On January 6, 2019, at approximately 11:00 p.m., Maine State Police Trooper John Darcy

was on patrol in a marked State Police cruiser on Interstate 95 in the vicinity of York, Maine.

Trooper Darcy observed a 2017 Dodge Journey (hereinafter, the "Dodge Journey") travelling

northbound in the far right lane.[1]  Trooper Darcy observed the Dodge Journey signal and move

into the middle lane, pass a tractor trailer in the right lane, then abruptly move back into the right

lane, while failing to signal until already in the right lane. Trooper Darcy also observed that in

moving to the right lane, the Dodge Journey pulled directly in front of the tractor trailer, leaving

little room between the two.  Trooper Darcy activated his vehicle emergency light, and the

Dodge Journey pulled over.

Trooper Darcy approached the Dodge Journey, and observed the defendant in the driver's

seat and a female individual laying in the rear seat of the vehicle.  The defendant produced a

Maine Identification Card.  Trooper Darcy asked whether the defendant had a license, and the

---

[1] Video and audio surveillance from the WatchGuard systems in Troopers John Darcy, Patrick Flanagan, and
Jonathan Russell will be provided to the Court in advance of any suppression hearing.

defendant replied that he did not, and that he was driving because the female passenger was tired. Trooper Darcy asked the defendant to step out of the vehicle, and the defendant complied. The defendant consented to a pat down for weapons, and during the ensuing pat down, Trooper Darcy recovered a knife from the defendant's pocket.  In response to questioning, the defendant admitted that his driver's license was suspended, and that he was on bail. The defendant also stated in response to Trooper Darcy's questions, that they were shopping in Kittery, but had not bought anything, and were just "window shopping."

Trooper Darcy then engaged in a conversation with the female passenger, during which the female passenger stated, in substance, that she and the defendant were coming from New London, Connecticut, where she had dropped off her niece and Fagan had visited a friend.  The inconsistent stories roused Trooper Darcy's suspicions, and he requested that another Trooper respond with a narcotics sniffing canine.

While waiting for the arrival of the canine, Trooper Darcy performed computer checks of the defendant and his passenger, learning that the defendant had a suspended driver's license, and was subject to bail conditions  that provided "*In order to determine if I have violated any prohibitions of this bond regarding alcoholic beverages, illegal drugs or their derivatives, marijuana or marijuana products or dangerous weapons, I will submit to searches of my person, vehicle and residence at any time without articulable suspicion or probable cause*."[2]  Trooper Darcy subsequently placed the defendant in handcuffs, and advised him that he was not being arrested, but was being detained.

---

[2] The defendant agreed to the bail conditions as a condition of his release on charges of Aggravated Drug Trafficking and related offenses in the Unified Criminal Court in Houlton, Maine, under Docket No. ARDCD-CR18-30094.

As the defendant waited, handcuffed, outside police cruiser, Trooper Darcy resumed speaking with the female passenger. Other Troopers arrived, at various times, including Sergeant Thomas Pappas, Trooper Patrick Flanagan, and Trooper Jonathan Russell, who brought his trained narcotics detection canine.

Trooper Russell led his narcotics detection canine around the Dodge Journey, and the canine did not alert. While Trooper Russell led the canine around the Dodge Journey, Trooper Flanagan let the defendant sit in his cruiser. Trooper Flanagan and the defendant engaged in a conversation in which the defendant, in substance, indicated that he was originally from Connecticut but was living in Limestone, Maine, and that he and the female passenger were on their way home from visiting friends in Connecticut. After Trooper Russell finished with the dog sniff of the Dodge Journey, Trooper Flanagan asked the defendant to step out of his vehicle. Trooper Russell then led his canine around the defendant and the female passenger, and the canine did not alert to either person. Trooper's searched the Dodge Journey pursuant to the defendant's bail conditions, and found no contraband.

After the conclusion of the canine sniff, Trooper Flanagan allowed the defendant to sit in his cruiser. At approximately 12:10 a.m, Trooper Flanagan read the defendant *Miranda* warnings. At the conclusion of the warnings, when asked if he wished to answer questions, the defendant stated "No, Sir."  After the defendant's initial invocation of his right to silence, Trooper Russell ended his conversation with the defendant. There was no further significant conversation with the defendant for a period of time, until Trooper Darcy attempted to search the defendant, at approximately 12:18 a.m. During the search, engaged in conversation with to the defendant to facilitate the search. Trooper Darcy observed the defendant clenching his buttocks and legs tightly during the search, Trooper Darcy informed the defendant that Trooper Darcy

3

believed he was concealing something in his buttocks. After Trooper Darcy commented on his belief that the defendant was concealing something, the defendant reached towards his pants, and stated "I'm getting it."  Trooper Darcy then engaged in a brief conversation with the defendant to determine what the defendant was trying to do, and the defendant made no further incriminating statements until the re-administration of *Miranda* warnings.

The defendant was let into Trooper Darcy's cruiser, where Trooper Darcy and Sergeant Pappas briefly spoke to the defendant, but did not initially ask any questions.  Trooper Darcy and Sergeant Pappas discussed, in substance, the possibility of the defendant's release, and their desire to recover the drugs they suspected were concealed on his person. Sergeant Pappas then provided the defendant with *Miranda* warnings.  The defendant indicated that he had been provided the warnings by another officer, but did not indicate that he had previously refused to speak. As the defendant was being provided his rights, he indicated that he knew his rights, and had known them since he was 17. After being advised of his rights the second time, the defendant did not indicate that he wished to remain silent, and proceeded to speak with the Troopers.

As the defendant sat in the cruiser, Trooper Darcy and Sergeant Pappas engaged in back and forth conversation with the defendant.  During this conversation, Trooper Darcy and Sergeant Pappas continued to speak about the likelihood of the defendant's release if he handed over the drugs, indicated that they had the authority to issue him a summons as opposed to arresting him immediately, and discussed their desire to recover the drugs they suspected were secreted on his person. While Trooper Darcy and Sergeant Pappas indicated in substance, that they didn't care about small quantities of drugs, and that they weren't interested in arresting drug users, they never indicated that the defendant would not be charged, or that the defendant would

4

receive any leniency with respect to potential charges.[3] During this conversation, the defendant ultimately indicated, in substance, that he had 27 grams secreted in his buttocks. Trooper Darcy and Sergeant Pappas then asked the defendant to retrieve the items, and discussed how to accomplish the task with the defendant. The defendant was offered the opportunity to be brought to a more private location where the defendant could remove the item. The defendant was ultimately provided with latex gloves, and let outside of the cruiser, where he removed a plastic bag from his buttocks area, and placed it into an evidence bag provided by the Troopers.  The plastic bag was subsequently determined to contain a quantity of fentanyl.

The defendant was asked if he wanted to speak with Troopers any further and declined. The defendant was then un-handcuffed and the defendant was driven by the female passenger in the Dodge Journey and drive to another location near the highway, with the Troopers following closely. The defendant was fingerprinted with a mobile fingerprint unit and issued a summons for State charges of Aggravated Drug Trafficking, Violating Conditions of Release, and Operating while license is suspended or revoked.  The defendant was released, and later charged in the instant case.

## ARGUMENT

### I.   THE DEFENDANT WAS LAWFULLY STOPPED BASED ON REASONABLE SUSPICION THAT A TRAFFIC VIOLATION HAD OCCURRED

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "It is common ground that a traffic stop constitutes a seizure of both the stopped vehicle and its occupants for Fourth Amendment purposes." *United States v. Arnott*, 758

---

[3] The above is intended as a brief summary of the conversation. The entirety of the conversation was recorded via the audio feature of Trooper Darcy's WatchGuard System.

F.3d 40, 43 (1st Cir. 2014). Because "[a] traffic stop constitutes a seizure of 'everyone in the vehicle' for purposes of the Fourth Amendment," it "must be supported by reasonable suspicion that a traffic violation has occurred." *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

In this case, Trooper Darcy had reasonable suspicion to believe that the defendant changed lanes without proper signaling and passed another vehicle in an unsafe manner, violating Maine Traffic Laws. Trooper Darcy observed the defendant's vehicle move from the right lane to the middle lane to pass a tractor trailer travelling at highway speeds, in the dark of night.  Trooper Darcy observed that the defendant's vehicle quickly moved from the middle lane, back into the right lane, at an exceedingly close distance from the tractor trailer.  Further, Trooper Darcy observed that the defendant's vehicle failed to timely display a turn signal to safely indicate the lane change, and that the turn signal was not initiated until the vehicle was almost entirely in the right lane.

Defendant cites *United States v. Mercer*, 2014 WL 22169999 (D. Me. 2014) and *Pooler v. Clifford*, 639 A.2d. 1061 (Me. 1994) to support his proposition that "there is ***no requirement*** that a vehicle changing lanes on a highway use a turn signal." *Defendant's Motion to Suppress*, 7. *Emphasis added*.  Contrary to the defendant's assertion, neither of these cases holds that a turn signal is ***never required*** when changing lanes.  In *Mercer*, the court merely opined in a footnote that "it is not clear that 29–A M.R.S.A. § 2071… obliges a driver to signal when changing lanes," yet did not reach a decision on that question as the defendant had not raised the issue. *United States v. Mercer*, 2014 WL 22169999 (D. Me. 2014) at 7, n.4. This statement of uncertainty offers weak support for the defendant's assertion that a lane change never requires signaling.

6

*Pooler v. Clifford* is even less supportive of the defendant's proposition. In that case, the Maine Law Court interpreted 29 M.R.S.A.§1199, the predecessor statute to 29-A M.R.S.A. §2071 as follows: "[a]lthough we cannot say that no signal is required prior to making any kind of side to side movement, or lane change," a jury instruction stating that "a driver has a duty to make a turn signal at least 100 feet prior to moving left or right upon a roadway" would have been "an incorrect statement of the law." *Pooler v. Clifford*, 639 A.2d. 1061 (Me. 1994).  *Pooler v. Clifford*, therefore, holds only that there is no per se requirement to make a turn signal at least 100 feet prior to moving to the left or right on the roadway, while acknowledging the possibility of situations where a turn signal would be required in making a lane change.

The validity of the stop here depends not only on whether a turn signal was utilized, but more broadly, whether the lane change complied with the requirement that it be made safely. Each of the Maine Traffic Laws dealing with changing lanes include some requirement that the lane change be made in a safe manner.  29-A M.R.S.A. §2051(1-A) requires that "[a] vehicle may not be moved from a lane until the operator has first ascertained that the movement can be made with *safety*."  29-A M.R.S.A. § 2070(1) requires that "[a]n operator of a vehicle passing another vehicle proceeding in the same direction must pass to the left at a safe distance and *may not return to the right until safely clear of the passed vehicle*. 29-A M.R.S.A. § 2070 (1). 29-A M.R.S.A. § [a]n operator may not turn a vehicle or move right or left on a public way unless the movement can be made with *reasonable safety*. 29-A M.R.S.A. § 2071(1).  The key question than, is whether the defendant's passing maneuver was unsafe, and the evidence demonstrates that it was not.

The defendant passed the tractor trailer unsafely, thus violating Maine Traffic law. Specifically, the defendant "cut off" the tractor trailer, leaving insufficient room between his

vehicle and the tractor trailer.  The unsafe nature of this maneuver was amplified by the

defendant's failure to utilize the turn signal until the lane change was nearly complete. The

defendant argues that because the driver of the tractor trailer did not engage in "sudden or

evasive maneuvers" and the tractor trailer's brake lights did not come on, the lane change was

safe.  However, the truck driver's reaction is a poor measure for the safety of the lane change.

The defendant assumes that the tractor trailer driver would be able to immediately perceive and

react to his abrupt, un-signaled, and unsafe lane change.  Further, the defendant assumes that the

appropriate response of the tractor trailer driver, would be to brake, or engage in immediate

evasive maneuvers. These unproven assumptions cannot outweigh clear evidence that the lane

change was not made safely. A trained and experienced Maine State Police Trooper personally

observed the lane change, and concluded that it was unsafe. Further, the lane change was

captured via video surveillance from which the unsafe nature of the maneuver is readily

apparent. Therefore, the stop of the defendant's vehicle was supported by reasonable suspicion

that the lane change was made unsafely, in violation of Maine Traffic law.

## II.    TROOPERS HAD A LAWFUL BASIS TO SEARCH THE DEFENDANT PURSUANT TO BAIL CONDITIONS

Shortly after the initial stop, Trooper Darcy learned that the defendant was on bail, which

included the condition that "*In order to determine if I have violated any prohibitions of this bond*

*regarding alcoholic beverages, illegal drugs or their derivatives, marijuana or marijuana*

*products or dangerous weapons, I will submit to searches of my person, vehicle and residence at*

*any time without articulable suspicion or probable cause*."[4]  The specific state bail conditions

imposed in the defendant's state case have been expressly approved by the Maine Supreme

---

[4] The defendant agreed to the bail conditions as a condition of his release on charges of Aggravated Drug
Trafficking and related offenses in the Unified Criminal Court in Houlton, Maine, under Docket No. ARDCD-
CR18-30094.

Judicial Court. *State v. Ullring,* 741 A.2d 1065, 1072-73 (Me. 1999) ("[t]he overriding purpose of the bail system in Maine is to ensure the appearance of the defendant at trial and to do so without incarceration as long as conditions can be imposed which will fulfill that purpose and the purpose of ensuring the integrity of the judicial process. Bail conditions, such as a prohibition against possession of illegal drugs and searches for illegal drugs, help to ensure that defendants whose backgrounds and charges indicate that substance abuse is a significant problem will show up at court. It is reasonable to expect that a defendant who maintains sobriety is more likely to appear in court on the appointed dates that a defendant who is under the influence of drugs or alcohol."). Moreover, a drug search and testing condition imposed on a defendant, whose bail resulted from an arrest for Aggravated Drug Trafficking and who had a history of drug related convictions and bail violations, is entirely reasonable under the circumstances.[5]

The same type of bail conditions at issue in this case have been approved by this Court. *See United States v. Gates* Criminal No. 08–42–P–H., 2008 WL 5382285 (D. Me. 2008) (Rich, Mag. J.) *Adopted by United States v. Gates* 08–42–P–H., (ECF No. 134) (D. Me. 2009) "In the context of a search and seizure undertaken pursuant to bail conditions, the government meets its burden of showing consent to such a search by pointing to bail conditions permitting it." *Id. Citing State v. Ullring*, 1999 ME 183, 26, 741 A.2d 1065, 1073. "The burden then shifts to the defendant to present evidence showing that the bail conditions were unreasonable in the circumstances." *Id.* The First Circuit affirmed the District Court's finding in *United States v. Gates*, on the grounds that the defendant had consented to a search of his residence. *United States v. Gates* 709 F.3d 58, 64 (1st Cir. 2013). The First Circuit noted, that "[the District Court] supportably found that the search was independently justified by the extant bail conditions. After

---

[5] The Court is aware of the defendant's criminal history based on documents submitted to the Court during this case.

all, the defendant had agreed, as part of his bail conditions incident to the charges of disorderly conduct and resisting arrest, to submit to searches of his person and residence at any time, even in the absence of articulable suspicion. We see no reason why we should not give the plain language of such a bail condition force and effect." *Id. See also United States vs. Dennis Gauthier*, Criminal No. 10–35–P–S. 2010 WL 3488665 (D. Me. 2010)(Rich, Mag. J.) *Affirmed by United States vs. Dennis Gauthier*, Criminal No. 10–35–P–S. 2010 (ECF No. 141) (D. Me. 2010). Accordingly, Troopers were authorized to search the defendant's person and vehicle pursuant to the bail conditions, and any such search was lawful.[6]

## III.    THE DEFENDANT'S STATEMENTS

Defendant moves to suppress all of his statements made after invocation of the right to remain silent following the first set of *Miranda* warnings provided by Trooper Russell. The government agrees that the defendant did in fact indicate that he did not want to speak to Trooper Russell, thus invoking his right to remain silent. However,  "[u]nlike an unambiguous request for counsel, after which questioning must invariably cease until a lawyer is provided, an invocation of the right to remain silent does not automatically bar the resumption of questioning at a later time." *United States v. Oquendo-Rivas* 750 F.3d 12, 17 (1ˢᵗ Cir. 2014) citing *United States v. Andrade,* 135 F.3d 104, 107 (1st Cir.1998). "Rather, in determining the appropriateness of renewed questioning, our inquiry focuses on whether the suspect's 'right to cut off questioning' was at all times "scrupulously honored." Id. citing *Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). "After an initial invocation of the right to remain silent, four

---

[6] The government also contends that the search of the defendant can also be justified as incident to lawful arrest, since Troopers had probable cause to arrest the defendant the defendant for violating bail conditions and for driving with his license suspended. A search incident to a lawful arrest is an exception to the warrant requirement. *Riley v. California*, 573 U.S. 373, 382–85 (2014); *see also Mitchell*, 139 S. Ct. at 2543. Thus, police may conduct a "full search of the person" pursuant to a lawful arrest, even without a warrant. *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2175−76 (2016) (citing *Robinson*, 414 U.S. at 235).

factors are relevant to determining whether the resumption of questioning is permissible: (1) whether a reasonable period of time passed prior to the resumption, (2) whether the same officer resumed questioning, (3) whether the suspect received refreshed *Miranda* warnings, and (4) whether questioning concerned the same alleged crime." Id. citing *United States v. Lugo Guerrero,* 524 F.3d 5, 12 (1st Cir.2008). "Beyond assessing these factors, however, our ultimate review must account for the 'totality of the circumstances,' with an eye to determining whether the suspect retained the ability to choose whether and when to speak. *Id.* (quoting *United States v. Thongsophaporn,* 503 F.3d 51, 57 (1st Cir.2007)).

Examining the four factors outline in *United States v. Oquendo-Rivas,* it is clear that at least some of the factors weigh in favor of the permissibility of resumed questioning.  First, with respect to the requirement of a "reasonable period of time", the First Circuit has previously refused to set any specific time limit, noting that "[i]t would be both unwise and unworkable, however, to try and demarcate a one-time-fits-all limit for assessing reasonableness, which at its worst might only send interrogating officers running for their stopwatches."  *United States v. Oquendo-Rivas* 750 F.3d 12, 18 (1st Cir. 2014).  While there was not an extended period of time between the two warnings in this case, there was at least some period during which the defendant's decision was honored. Further, the second set of warnings, and subsequent questioning occurred only after the defendant responded Trooper Darcy's attempts to get the defendant to cooperate with the search of his person.  Second, different Troopers administered the second set of warnings.  Third, the defendant was provided with a fresh set of warnings. The fourth factor, whether questioning concerned the same crime, does not cut in either direction, because the defendant immediately invoked his right to silence upon the first *Miranda* warnings, he was not questioned further until after Trooper Darcy's search.

Another factor that weighs in favor of the permissibility of resumed questioning, is that the defendant himself began to speak to Troopers in response to a search, and Trooper Darcy's accusation that the defendant was clenching his buttocks.[7] "It is well-settled that law enforcement may resume questioning a defendant in custody who has exercised his right to remain silent if the defendant subsequently initiates further discussions about the investigation." *United States v. Thongsophaporn*, 503 F.3d 51, 56 (1st Circuit 2007) (citations omitted). It is evident from the dash cam video and audio recordings of the encounter that Trooper Darcy's comments to the defendant during the search were not made to elicit an incriminating response, but to encourage the defendant to cooperate with Trooper Darcy during the lawful search and/or to discourage the defendant from making sudden moves into his pants. The defendant spontaneously, in the sense that his action was not precipitated by interrogation, reached towards his buttocks area and stated, "I'm getting it."[8] Accordingly, the fact that the defendant himself initiated further conversation in response to the Trooper's lawful search weighs heavily in favor of the permissibility of the resumed questioning.[9]

## IV.    THE DEFENDANT VOLUNTARILY REMOVED THE FENTANYL FROM HIS PANTS AND GAVE IT TO THE TROOPERS

"Valid consent renders a warrantless search constitutionally permissible, and while consent must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it." United States v. Perez–Montañez,

---

[7] The defendant's claim that this search was unduly intrusive is unavailing. The defendant remained fully clothed and was given the opportunity to voluntarily retrieve the drugs from his buttocks, rather than being subjected to a more intrusive search of his intimate areas.

[8] The government further contends that this statement, combined with all other factors known to the Troopers, clearly provided probable cause to believe that the defendant had drugs secreted on his person.

[9] Even if the resumption of questioning after the defendant's invocation of the right to silence was improper, this should not result in suppression of the fentanyl recovered from the defendant by his voluntary removal of the item from his buttocks. An unambiguous invocation of the right to remain silent does not prevent the police from asking for, and receiving, a consent to search, because the Fifth Amendment only protects against providing testimonial evidence. See *United States v. Calvetti*, 836 F.3d 654 (6th Cir. 2016).

202 F.3d 434, 438 (1st Cir. 2000). "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was freely and voluntarily given; there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority." Id. (citation and internal quotation marks omitted).

"Voluntariness turns on a number of factors, including the person's age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Coraine*, 198 F.3d 306, 309 (1st Cir.1999) (citation and internal quotation marks omitted). "The court can also consider whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." Id. (citations and internal quotation marks omitted). "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *United States v. Mares*, 428 F.3d 64, 67 (1st Cir.2005) (citation and internal punctuation omitted).

In this case, Troopers did not make any threats or false promises to induce the defendant to relinquish the fentanyl secreted on his person. The defendant was 43 years old and has a history of prior arrests and prosecutions, indicating that he is familiar with the legal system. The entire encounter between the defendant and the troopers was captured via video and/or audio recording, which will be available for the Court's review. The defendant has no apparent deficits in his intelligence. Accordingly, under the totality of circumstances shows that the defendant's will was not overborne.

Further, Troopers had multiple reasons for which they could lawfully search the defendant, including bail conditions, and by the time of the defendant relinquished the fentanyl,

had developed probable cause to believe the defendant had secreted illegal drugs in his buttocks. Accordingly, the fact that the Troopers had a lawful basis to search the defendant and seize the fentanyl from his person render's moot the defendant's challenge to the means by which the fentanyl was seized, *ie*. the defendant's removal of the item from his pants and relinquishment to the Troopers.  See *United States v. Doody* 2008 WL 3200674 Recommended Decision on Motion to Suppress (D. Me. 2008, M.J. Rich) Adopted by *ORDER adopting Report and Recommended Decision* ECF 45 (D. Me. 2008, J. Hornby).

Similarly, the fentanyl relinquished by the defendant would have been discovered upon his arrest for the violation of his bail conditions and for operating with a suspended license.  The fentanyl would have been recovered from the defendant's person during searches associated with arrest and jail intake, unless the defendant managed to destroy or hide it.  Accordingly, the fentanyl should not be suppressed because it would have ultimately or inevitably would have been discovered by lawful means. See See *Nix v. Williams,* 467 U.S. 431, 444 (1984).

## **CONCLUSION**

WHEREFORE, the United States respectfully requests that Defendant's Motions to Suppress be denied.

Dated at Portland, Maine this 13th day of December, 2019.

Respectfully submitted,

HALSEY B. FRANK
United States Attorney

/s/Nicholas M. Scott
Assistant U.S. Attorney
United States Attorney's Office
100 Middle Street
Portland, ME 04101
Nicholas.Scott@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certified that on December 13, 2019, I filed the foregoing Response to Defendant's Motions to Suppress using the Court's CM/ECF system, which will cause a copy to be sent to the attorneys of record:

Jonathan Goodman, Esquire

/s/Nicholas M. Scott
Assistant U.S. Attorney
United States Attorney's Office
100 Middle Street
Portland, ME 04101
Nicholas.scott@usdoj.gov

16