UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | CRIMINAL NO. 2:19-CR-123-DBH |
| ) | |
| DAMON FAGAN, ) | |
| ) | |
| DEFENDANT ) | |

**SUPPLEMENTAL RULING ON MOTION TO SUPPRESS**

State troopers found heroin on Damon Fagan during a turnpike traffic stop on January 6, 2019. The United States is now prosecuting Fagan for possessing that heroin with the intent to distribute it. Indictment (ECF No. 24). Fagan wants me to prevent the government from using the heroin as evidence at his trial. In a bench ruling on February 11, 2020, I previously denied his motion to suppress. (ECF No. 75). I found that the state troopers did not violate the Fourth Amendment because a reasonable police officer would have had probable cause to pull Fagan over for a traffic violation. Tr. of Hr'g on Mot. to Suppress at 5 (ECF No. 79).

The only items of evidence concerning the traffic violation were the video from Trooper John Darcy's dashboard camera preceding and during the stop and the trooper's testimony about what he observed. After the ruling, Fagan's lawyer discovered recorded statements by Trooper Darcy during a later, August 2019, traffic stop, which the lawyer argued showed racial bias in Darcy's choices of which vehicles to stop. He asked me to reopen the proceeding. The government

consented. I reopened the proceeding and allowed limited discovery about Darcy's communications with others on January 6, 2019.

As a result, on July 1, 2021, the government elicited further testimony from Trooper Darcy and submitted evidence of what he had said during the later traffic stop.[1] Fagan's lawyer then cross-examined Darcy and introduced new evidence about texting that occurred between Darcy and a fellow trooper before Darcy stopped Fagan and about the timing of Darcy's inquiry concerning the registration of the car Fagan was driving.[2] After the hearing, the parties by agreement introduced a "Stipulation and Exhibit," namely, excerpts from a statement Trooper Darcy provided on April 13, 2021, at the Maine State Police

---

[1] During the August 2019 incident, Darcy told a fellow trooper:

| | |
|---|---|
| Trooper Darcy: | Like if I see a white thug, I'm going to be interested, just like a Black thug, or a fuckin' Chinese thug. Like, I'm interested in thugs. We don't, that's not racial profiling. Like, some Black guy goes by, and he's just some normal dude from Portland, I don't give a fuck, you know what I mean? Like whatever. This guy kind of looks like a thug, to be honest with you. |
| Other Trooper: | You see the guy driving? |
| Trooper Darcy: | Yeah. He's wearing a wife-beater, he's got dreads, he looks like a thug, he may not be. And I'm not profiling him racially, because I don't care that he's white, Black. White kid, neck tats all over him, fucking sideways hat, thug, you know what I mean? So like I get . . . I hate when people try to make it seem like that's what it is. I care about where people are from, and they way they seem, do you know what I mean? Like, do they seem like they could be involved in the drug game, or gangs, or something, you know what I mean? I don't give a fuck if somebody's Black, white, like . . . And I like saying this, Nicole has a fucking niece who is half Black, I'll tell someone like, my niece is half-Black, don't play that racial shit with me. |

Gov't's Ex. 5A.

[2] Darcy testified at the first hearing that he did not remember when he first focused on Fagan's vehicle. At the second hearing he testified that he later looked at a BMV time-stamped query and "recently learned" that he had run Fagan's license plate through a computer check about 3 minutes before he pulled Fagan over.

2

Office of Professional Standards.  I have considered all the foregoing, and I now make my rulings based upon the record as augmented.[3]

I begin with three basic principles that federal trial judges must apply.

First, racial profiling is reprehensible.  The Supreme Court said in a 1996 traffic stop case: "We of course agree . . . that the Constitution prohibits selective enforcement of the law based on considerations such as race."  Whren v. United States, 517 U.S. 806, 813 (1996).

Second, the issue is what remedies are available when racial profiling does occur.  The Fourth Amendment prohibits "unreasonable searches and seizures."  An automobile stop is a seizure and in cases like this requires "probable cause to believe that a traffic violation has occurred."  Id. at 809-10.  A motion to suppress, like Fagan's here, asserts that law enforcement violated the Fourth Amendment (not the Equal Protection Clause) in stopping the vehicle.  It asks that the prosecution not be allowed to use the evidence thereby acquired (here the heroin) even though it might be highly probative of his guilt.  But the Supreme Court has said: "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, *not the Fourth Amendment.*"  Id. at 813 (emphasis added).

Third, the standard for Fourth Amendment probable cause, like that for reasonable suspicion, is objective; "the objective nature of the inquiry ensures that courts will focus not on what the officer himself believed but, rather, on

---

[3] There are other aspects to my earlier ruling, but the only challenge on the supplemental hearing is whether there was probable cause for the traffic stop.

what a reasonable officer in his position would have thought." United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007).

I now apply those principles to the January 6, 2019, stop.

Fagan argues that Trooper Darcy on that night was not simply watching turnpike traffic for violations, but, as he told a fellow trooper, "hopefully we can all get into something" (referring to uncovering some sort of criminal activity) and that he was "on the hunt," "being proactive," and might need his colleague's narcotics detection dog.  Fagan argues that Darcy's comments to a fellow trooper during an August 2019 stop (quoted in footnote 1) show that he regularly looked for and stopped African American drivers in particular, and that Darcy was not acting as a "reasonable police officer," the standard courts use in determining whether there was a proper basis for a traffic stop.

But on a motion to suppress evidence in a criminal case, according to the Supreme Court, Darcy's motivations are irrelevant: "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren, 517 U.S. at 813.  According to the Supreme Court, its cases "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."  Id.  As the First Circuit said in 2018:

> Although the officers' initial and primary interest in observing [the driver] was his possible activity in the illegal drug trade, not the bizarre driving for which they stopped him, or his unlawful failure to respond readily to the lights and siren, their ulterior motive is of no consequence under the Fourth Amendment.

United States v. Favreau, 886 F.3d 27, 30 (1st Cir. 2018) (citing Whren).

I therefore need not decide for Fourth Amendment purposes whether Darcy stopped drivers in general and Fagan in particular based upon on racial criteria.  Instead, I will assume for purposes of this decision that Darcy did use racial criteria (Darcy denies that interpretation of his comments).  I will also assume that he was "on the hunt," "being proactive," and trying to "get into something."  I will also assume that Darcy singled out Fagan's car about the time it went through the York toll plaza, *i.e.*, about three minutes before he pulled Fagan over.[4]  I do not determine whether Trooper Darcy was a reasonable police officer.  The "reasonable police officer" standard is a hypothetical construct by which a court determines whether the information the arresting officer possessed would permit a reasonable police officer to conclude that a violation had occurred.  It does not require that the arresting officer actually be a "reasonable police officer."

All of this matters in this case because the key question is: what information did Trooper Darcy have when he made the traffic stop?  Even after the supplemental hearing, the only evidence on that question is Darcy's testimony and what his dashboard camera showed.  No one else testified in either the original or the recent hearing.  The question is complicated by the fact that when he stopped Fagan, Darcy believed Fagan's late turn signal (Fagan signaled he was returning to the right lane only after he was already partly there) was itself a violation, which I have ruled was an incorrect interpretation of Maine

---

[4] I said in my initial ruling that "[w]hen the state trooper first focused on the car is not material to my decision."  Tr. of Hr'g on Mot. to Suppress at 2 (ECF No. 79).

law.[5] During the stop, Darcy told Fagan that he stopped him because of the late signal and because Fagan cut off the tractor-trailer he was passing. Darcy reaffirmed the latter reason at both hearings.

In my original decision I said that the video was not definitive one way or the other:

> The video from the dash cam does not contradict the trooper. To the extent that I can make any judgment from the perspective of the dash cam recording, it does appear that the return to the right lane was abrupt. This was a high-speed highway, late at night. The behavior of the tractor trailer driver in not activating his brakes or taking evasive maneuvers is of little benefit because I have no idea how alert the tractor trailer driver was or how aggressively he drove. And so I conclude . . . that, regardless of Trooper Darcy's erroneous belief that a signal was always required for a lane change, a reasonable officer could believe that there was probable cause for this traffic stop.

Tr. of Hr'g on Mot. to Suppress at 4-5 (ECF No. 79).

I reaffirm that from the video it appears that Fagan's car abruptly returned to the right-hand lane after passing the tractor-trailer, but I cannot determine actual separation distance between the two vehicles.

The question before me on the reopened motion is whether Darcy lied in saying that Fagan executed an unsafe return to the right-hand lane. If Fagan's maneuver was not unsafe, then the hypothetical reasonable police officer had no basis to pull him over. So in making my determination I consider Darcy's text messaging before the stop, the timing of his inquiry into Fagan's vehicle registration, Darcy's racially charged remarks in the August 2019 stop, and the excerpted statement he made April 13, 2021, at the Maine State Police Office of

---

[5] In my initial ruling, I observed that the Maine Law Court interprets Maine statutes as not requiring a turn signal for every lane change, and that the standard instead is safety. I am governed by the Law Court's interpretation of state law.

6

Professional Standards, but only as they bear upon whether to believe that Darcy saw Fagan make an unsafe lane change.

I continue to find that testimony credible. As before, it is not contradicted by the dashcam video. Assuming that Darcy had singled out Fagan's vehicle for improper reasons as it went through the York toll plaza, he waited 3 minutes before he found a basis to pull him over. Even though Darcy thought the late turn signal was enough, he also told Fagan contemporaneously that Fagan had changed lanes unsafely,[6] so his testimony about an unsafe lane change is not simply an after-the-fact creation once he learned he had been wrong on the law.[7] Given his initial belief that the late turn signal was enough for the traffic stop, it is a stretch to conclude that his statements to Fagan about safety were merely an effort to cover up racial profiling. Therefore, irrespective of Darcy's personal motivation, I do not find that Darcy lied in giving the unsafe lane change explanation and find his testimony credible.

Accordingly, the defendant's motion to suppress is once again **DENIED**.

**SO ORDERED.**

**DATED THIS 29TH DAY OF JULY, 2021**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[6] I said in my original ruling:
> Darcy told the defendant that he cut off the tractor trailer and that he signaled his lane change too late. At the hearing Darcy testified that the defendant cut off the tractor trailer, that it was very close to the front of the tractor trailer, not leaving much space for any reaction time, did not leave a safe distance in between as it cut in front of the vehicle, and if it had to stop shortly it would have caused a collision most likely.

Tr. of Hr'g on Mot. to Suppress at 3 (ECF No. 79).

[7] Darcy testified at the first hearing that he learned later, but before the hearing, that his belief that every lane change required a turn signal was an incorrect interpretation of the law.

7